UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JACOB W.,                              )
                                       )
       Plaintiff,                      )
                                       )
       v.                              )       Case No. 5:17-cv-150
                                       )
NANCY BERRYHILL, Acting                )
Commissioner, Social Security          )
Administration,                        )
                                       )
       Defendant.                      )

## ORDER
### (Docs. 8, 9)

Plaintiff Jacob W. brings this action under 42 U.S.C. § 405(g), requesting reversal of the

decision of the Commissioner of Social Security denying his application for disability insurance

benefits (DIB).  (Doc. 3.)[1]  Pending before the court is Plaintiff's motion to reverse the decision

of the Commissioner (Doc. 8) and the Commissioner's motion to affirm (Doc. 9).  For the

reasons stated below, Plaintiff's motion is DENIED and the Commissioner's motion is

GRANTED.

### Background

Plaintiff was 38 years old on his alleged onset date of October 31, 2013.  He was

diagnosed with hereditary spastic paraplegia (HSP) in March 2010.  (AR 68, 366, 594–95.)[2]  At

---

[1] The complaint states that Plaintiff also applied for supplemental security income under
Title XVI of the Social Security Act (Doc. 3 ¶ 5), but the record reflects only a claim for DIB
under Title II.

[2] Spastic paraplegia is "paresis [partial or incomplete paralysis] of the lower extremities
with increased muscle tone and spasmodic contraction of the muscles."  *Stedman's Medical
Dictionary* 652310 (28th ed. 2006) (Westlaw).  HSP is a disorder "characterized by progressive
weakness and spasticity (stiffness) of the legs."  *Hereditary Spastic Paraplegia Information
Page*, Nat'l Insts. of Health, https://www.ninds.nih.gov/Disorders/All-Disorders/Hereditary-

that time, he expected that his symptoms would permit him to work for another 10 to 15 years. (AR 69.) But according to Plaintiff's testimony, the symptoms "kicked up a lot faster than I expected them to." (*Id.*) He testified that he quit his full-time boat-building job with Adirondack Guide Boat in June 2013 because he "physically could not keep up with the day-to-day work." (AR 53–54, 58.) He then did some part-time work sanding timber for a friend in the fall of 2013 but stopped because the work after the sanding was done was more labor-intensive and because the colder weather affected the spasticity in his legs. (AR 59, 262.)

Plaintiff testified that he believes he cannot return to work because "[o]n a day-to-day basis I'm not sure how much energy I'm going to have or when my symptoms are going to be too extreme for me to either drive or to concentrate when I'm doing things." (AR 54.) He also testified that he is on medications, including medical marijuana. He is unable to drive legally when using marijuana, and testified that he finds it hard to find a safe place to medicate while at work. (*See id.*) He testified that he needs to be able to take breaks at will and to choose when to show up and when to stop working. (AR 55, 74.) Plaintiff further testified that his mental health has suffered in recent years because he is unable to support himself. (AR 70.)

Plaintiff is divorced with no children. (AR 49.) A 2015 treatment note indicates that he has friends and also a new girlfriend. (*See* AR 531.) He completed high school and one year of college studying photography. (AR 51.) As of March 2016 he was living in a house with a self-employed housemate. (AR 49, 52–53.) He is able to navigate the stairs in the house using handrails and the side of the wall. (AR 50.) He receives financial support from his parents

---

spastic-paraplegia-Information-Page (last visited Feb. 1, 2019). "Early in the disease course, there may be mild gait difficulties and stiffness. These symptoms typically slowly progress so that eventually individuals with HSP may require the assistance of a cane, walker, or wheelchair." *Id.*

2

(AR 52), but it is difficult for him to accept that support because his parents need the savings, in part because his mother also deals with HSP. (AR 540.) He is home alone while his housemate works, and testified that he spends time trying to sleep when his symptoms become uncomfortable. (AR 53, 74.)

On a typical day Plaintiff watches the news, does stretches, and does five- to ten-minute chores that do not involve lifting things from the floor. (AR 72.) He takes up to three warm baths per day because it helps with his HSP symptoms. (AR 72–73.) He also reads, listens to music, and draws. (AR 73.) He goes out to dinner once a week, but sometimes avoids going out in public because he does not like "stumbling around in public" or having to explain to people who ask what is "wrong" with him. (*Id.*)

Plaintiff filed an application for DIB on April 29, 2014. (AR 103.) His claim was denied initially on September 8, 2014 (*id.*), and upon reconsideration on February 2, 2015 (AR 120). He requested a hearing, and Administrative Law Judge (ALJ) Elizabeth M. Tafe conducted a hearing on March 4, 2016. (AR 38–91.) Plaintiff appeared at the hearing and was represented by attorney Kelly Massicotte. Vocational Expert (VE) Jack Bopp also testified. ALJ Tafe issued an unfavorable decision on August 30, 2016. (AR 17–31.) The Appeals Council denied Plaintiff's request for review (AR 1), and he appealed to this court on August 8, 2017. (Doc. 3.)

## **ALJ Decision**

Social Security Administration regulations set forth a five-step, sequential evaluation process to determine whether a claimant is disabled. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). First, the Commissioner considers "whether the claimant is currently engaged in substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial gainful activity, then the Commissioner considers "whether the claimant has a severe impairment

3

or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment, the inquiry is "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the Commissioner determines, "based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving her case at steps one through four. *McIntyre*, 758 F.3d at 150. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing that sequential analysis in her August 30, 2016 decision, ALJ Tafe first determined that Plaintiff has not engaged in substantial gainful activity since October 31, 2013, the alleged onset date. (AR 19.) At step two, the ALJ found that Plaintiff's severe impairments are HSP, depression NOS (not otherwise specified), and a history of substance abuse. (AR 20.) At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (*Id.*)

Next, the ALJ concluded that Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b)[3] except as follows:

---

[3] The regulations include the following definition of light work:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and

4

[A]bility to stand/walk for 4 hours each, and sit for 6 hours in an 8-hour workday, and with the option to change positions from sitting to standing or standing to sitting for an aggregate of 4–5 minutes each hour. He is able to occasionally climb ramps, stairs, ladders, and scaffolds, and occasionally balance, kneel, crouch, crawl, and frequently stoop. He is limited to rarely (defined as less than 10% of the workday) working in extreme cold, or with hazards such as moving mechanical parts or unprotected heights. He is able to perform simple tasks at a variable but acceptable pace, but not at a high production or assembly line type pace, and with no timed tasks. He is able to persist at simple tasks for 2 hours at a time in an 8-hour workday.

(AR 22.) At step four, the ALJ concluded that Plaintiff is unable to perform any past relevant work. (AR 29.) At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC, and concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cashier checker II, food checker, and clerical sorter. (AR 30.) The ALJ accordingly concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from October 31, 2013 through the date of the decision. (AR 31.)

## **Standard of Review**

The Social Security Act defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

---

pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

5

experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

On appeal, Plaintiff argues that the ALJ (1) failed to adequately consider his allegations regarding workplace "reliability" and his need to take breaks; (2) made other errors in assessing his credibility; and (3) erred in giving limited weight to the opinions of his primary care

providers. (Doc. 8 at 1–2.)[4] The Commissioner maintains that the ALJ's decision is legally

sound and is supported by substantial evidence. (Doc. 9 at 1.)

## I.    "Credibility"

Plaintiff argues that the ALJ "completely failed to consider" and "ignored" his allegations

regarding his problems with reliability and sustaining activity. (Doc. 8 at 7–8.) Plaintiff also

argues that the ALJ made further errors in her "credibility" determination. (*Id.* at 9.) The court

addresses the latter argument here, and then turns to Plaintiff's specific argument about his

workplace "reliability."

Plaintiff's arguments implicate the ALJ's duty to evaluate the intensity and persistence

of a claimant's symptoms. When performing that evaluation, ALJs are required to "consider all

of the available evidence, including your [the claimant's] history, the signs and laboratory

findings, and statements from you, your treating or nontreating source, or other persons about

how your symptoms affect you." 20 C.F.R. § 404.1529(c)(1).[5] The regulations further require

consideration of a series of factors relevant to the claimant's symptoms:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

---

[4] Although the record includes materials relating to Plaintiff's mental health, the court
perceives Plaintiff's arguments on appeal to be focused on impairments stemming from his
physical condition. The court has considered all of the evidence as part of its review, but focuses
here on physical functioning.

[5] Section 404.1529 has been revised effective March 27, 2017. *See generally Revisions
to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The
court cites and applies the regulations that were in effect at the time of the ALJ's decision. The
evaluation of symptoms outlined in § 404.1529 was previously called a "credibility" assessment.
The regulations and sub-regulatory policy no longer use the term "credibility," since "subjective
symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL
1119029, at *1 (Mar. 16, 2016).

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

The ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 23.) The ALJ recited the seven factors in § 404.1529(c)(3). (AR 23–24.) The court reviews the ALJ's symptom analysis, addressing Plaintiff's arguments in the process.

## A. "Totally" Disabled

At the outset of her evaluation of symptoms, the ALJ remarked that Plaintiff "alleges that his combination of impairments renders him totally disabled." (*Id.*) Plaintiff argues that he never claimed to be "totally" disabled and that the ALJ's reference to being "totally" disabled was unnecessary and inaccurate. (Doc. 8 at 11.) The Commissioner argues that, in context, the ALJ's reference to "total" disability "merely reflects Plaintiff's claim that he cannot perform any jobs on a sustained basis." (Doc. 9 at 6.)

The court finds no error with the ALJ's use of the modifier "totally." The ALJ's decision as a whole shows that the ALJ was aware of the applicable standard for disability. The ALJ

8

specifically referenced the statutory definition of "disability" (AR 17), the five-step sequential evaluation process for determining "disability" (AR 18–19), and concluded by noting that her "disability" evaluation was based on how that term is "defined in the Social Security Act" (AR 31). Read in proper context, the ALJ's reference to "totally disabled" is a shorthand reference to the disability standard under 42 U.S.C. § 423. *See Hilleshiem v. Colvin*, No. 13-cv-39-bbc, 2014 WL 26275, at *1 (W.D. Wis. Jan. 2, 2014) (ALJ's use of the phrase "totally disabled" would be ambiguous out of context, but ALJ's decision as a whole showed adherence to the proper standard of review; isolated reference to "total" disability was not an indication that the ALJ was "ignorant of the most basic question in the case"); *see also Roma v. Astrue*, 468 F. App'x 16, 19 (2d Cir. 2012) (summary order) (using same shorthand).

### B.  Objective Medical Findings as Part of Symptom Evaluation

After listing the seven factors in 20 C.F.R. § 404.1529(c)(3), the ALJ stated that "[t]he evidence of record reveals that the course of treatment and objective medical findings are not consistent with the claimant's alleged severity of symptoms and limitations." (AR 24.) Plaintiff asserts that this statement is "curious" because "the entire point of assessing credibility is based on the premise that objective findings cannot necessarily evidence the level of severity." (Doc. 8 at 10.) The Commissioner maintains that the applicable regulations actually required the ALJ to consider consistency with medical signs and laboratory findings. (Doc. 9 at 5.)

The regulations do indeed recognize that "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016) ("[W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments,

the same objective medical evidence, and the same non-medical evidence."). ALJ Tafe cited § 404.1529(c)(3) for just this proposition. (AR 23.) But there is nothing "curious" or erroneous about the ALJ's consideration of objective evidence together with other evidence as part of her symptom evaluation. *See* 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."); *id.* § 404.1529(c)(2) (objective medical evidence "is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work"); SSR 16-3p, 2016 WL 1119029, at *4 ("In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence . . . .").

Of course, in light of the fact that symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, a claimant's statements about the intensity and persistence of symptoms or the effect of those symptoms cannot be rejected "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2). But Plaintiff does not claim that the ALJ made that error. Indeed, the ALJ's analysis went beyond the medical evidence and discussed, for example, activities of daily living and opinion evidence. The court reviews those topics below.

## C.     Substantial Evidence Supports ALJ's Statements About Objective Findings

The ALJ stated that Plaintiff's records "clearly show evidence of hereditary spastic paraplegia and that functional limitations are significant, but are not at disabling levels." (AR 24.) Plaintiff asserts that the ALJ unfairly characterized much of the medical evidence. (Doc. 8 at 11.) The Commissioner maintains that the ALJ acknowledged abnormal physical

signs, and that substantial evidence supports her findings regarding Plaintiff's HSP symptoms. (Doc. 9 at 7.)  The court examines the alleged mischaracterizations in turn.

The ALJ found that Plaintiff's records show "reported difficulty walking, with periods of leg spasms and some pain, but his general exam notes are essentially normal." (AR 24.)  The ALJ wrote that "[e]xam notes in October 2014 reflect gait disturbance, but no ambulatory aid used, and normal sensory exam and strength in his lower extremities." (*Id.*)  The referenced examination notes—one for an October 2, 2014 appointment with neurologist Dr. Rup Tandan, and two for appointments on October 23 and December 11, 2014 with neurologist Dr. Waqar Waheed—do indeed reflect reports of leg spasms and pain.  (AR 449, 451, 453.)  The records also reflect gait disturbance, no ambulatory aid used, normal sensory exam, and strength in the lower extremities.  (AR 450, 452, 453.)

Plaintiff faults the ALJ for failing to mention other objective signs from the October 2014 records.  He asserts that the records also showed "increased tone consistent with spasticity, sustained clonus involving his ankles, generalized hyperreflexia +3 worse in the lower extremities, spastic gait, pain in hips and ankles, and weakness in hips and right ankle." (Doc. 8 at 11.)[6]  Those statements do indeed appear in the October 2014 records.  (AR 449, 450, 452, 453.)[7]  The Commissioner does not deny that, but asserts that the abnormal physical signs that Plaintiff highlights appear in other portions of the ALJ's decision.  (Doc. 9 at 7.)

---

[6] Clonus is "[a] form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders." *Stedman's Medical Dictionary* 182440 (28th ed. 2006) (Westlaw).  Hyperreflexia is "[e]xaggeration of the deep tendon reflexes." *Stedman's Medical Dictionary* 425830 (28th ed. 2006) (Westlaw).

[7] Plaintiff also points to a portion of Dr. Tandan's note from the October 2, 2014 appointment stating that Plaintiff reported stiffness in his legs, difficulty walking, leg soreness, and periodic episodes of significant spasms in his legs.  (AR 453.)  That statement appears in the "subjective" portion of Dr. Tandan's treatment note, so it is perhaps unremarkable that the ALJ

11

The court agrees that most of the physical signs that Plaintiff accuses the ALJ of failing to mention do appear in other portions of the ALJ's decision. Earlier in her decision, the ALJ noted that medical records reflected an HSP diagnosis in 2010 "with noted symptoms of persistent pain in legs, antalgic gait, and abnormal reflexes and clonus." (AR 20.) The ALJ also cited examination notes from November 2015 (AR 586) that showed "shuffle gait, hyperactive DTRs [deep tendon reflexes] patellar bilaterally, but intact sensory exam, and some decreased strength in the lower extremities." (AR 24.)[8] Overall, the court concludes that the ALJ's decision accurately reflects the statements in the treatment notes concerning the abnormal physical signs related to Plaintiff's HSP.

The ALJ also wrote that Plaintiff's records "reflect that physical therapy has been helpful, and that his balance and gait speed improved, and deemed safe for community ambulation." (AR 24.) Plaintiff does not dispute any of those statements. But he asserts that the ALJ "failed to include the numerous references to Plaintiff still having on-going issues" and thereby engaged in "selective cherry-picking of the evidence" to arrive at an unfair assessment of his difficulties with ambulation. (Doc. 8 at 12.) The Commissioner maintains that the record supports the ALJ's finding about PT being helpful, and that the finding of improvement is not negated just because Plaintiff continued to show signs of HSP even after PT. (Doc. 9 at 8–9.)

---

did not specifically quote it in her discussion of objective medical findings. In any case, the ALJ acknowledged the spasticity (stiffness) in Plaintiff's legs and his difficulty walking, pain, and leg spasms.

[8] Plaintiff asserts that the November 2015 examination was "hardly a normal exam" (Doc. 8 at 12) because it also showed increased tone in both lower extremities and gastroc (calf muscle) atrophy, and because the provider referred Plaintiff to physical therapy and acupuncture. (AR 586.) Although the ALJ found that Plaintiff's "general" exam notes were "essentially normal," the ALJ acknowledged the relevant otherwise abnormal findings. The court discusses Plaintiff's course of medical treatment below.

Substantial evidence supports the ALJ's conclusion that PT was helpful for Plaintiff. Dr. Waheed referred him for an occupational and physical therapy evaluation at the October 23, 2014 appointment. (AR 417.) The PT evaluation performed that date noted a gait "characterized by slower speed, spastic gait with very little foot clearance." (AR 427.) The therapist administered tests and provided therapeutic exercises and education to reduce fall risk. (AR 427–28.) At a second PT evaluation on December 11, 2014, Plaintiff continued to have some increased spasticity during ambulation, but demonstrated improved ability to complete a sit-to-stand test and increased gait speed. (AR 434.) The therapist stated that Plaintiff's spasticity "is being well controlled with the baclofen" and that "further skilled physical therapy intervention is not indicated at this time." (*Id.*)

Plaintiff's primary care provider, Shaw May, PA-C, LICSW, referred him to PT at an appointment on November 18, 2015. (AR 586.) Physical therapist Carol Price assessed good to excellent rehabilitation potential at a November 23, 2015 appointment. (AR 593.) At a January 14, 2016 appointment, Ms. Price noted that Plaintiff reported the "same number of 'worse' spells but some periods of better." (AR 592.) Plaintiff felt that he had "made gains in some areas," and Ms. Price indicated that he had achieved two of his goals. (*Id.*) She listed his rehabilitation potential as fair to good. (*Id.*)

According to Plaintiff, the ALJ improperly failed to mention notations in the PT records of his ongoing issues. For instance, the record from the December 11, 2014 PT appointment showed that Plaintiff's performance on a single limb balance test had improved from his performance at the October 23, 2014 appointment from 4 to 19 seconds on the left and from 8 to 15 seconds on the right. (AR 433.) The norm for Plaintiff's age and gender is 44.7 seconds. (AR 428.) The therapist also noted that Plaintiff "continues to have some increased spasticity

13

noted during ambulation and especially with increased pace of ambulation." (AR 434.) At the November 2015 appointment, Ms. Price remarked that the spasticity in Plaintiff's lower extremities "has been increasing with resultant inability to work, sleep, ambulate normally." (AR 593.) At the January 2015 appointment, Ms. Price stated that Plaintiff's "overall condition is variable partly [secondary to] colder weather which he reports increases his spasticity." (AR 592.)

The court is not persuaded that the ALJ engaged in impermissible "cherry-picking" regarding the PT records. It is of course improper for an ALJ to "recite only the evidence that supports his conclusion while ignoring contrary evidence." *Amy P. v. Comm'r of Soc. Sec.*, No. 2:17-cv-94, 2018 WL 2095345, at *6 (D. Vt. May 7, 2018) (quoting *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016)). But as discussed above, the ALJ did not ignore evidence of Plaintiff's spasticity or difficulties with ambulation. The ALJ also did not ignore the impact of cold weather on Plaintiff's symptoms, since the RFC includes a limitation on working in extreme cold. Neither is any of the evidence that Plaintiff cites contrary to the ALJ's conclusion that PT was helpful for Plaintiff.

Finally, Plaintiff takes issue with the ALJ's statement that "[h]is most recent exam notes show stable symptoms for HSP, and that Flexeril and marijuana help his symptoms." (AR 24.) Osteopathic physician John McPartland, D.O.—who diagnosed Plaintiff with HSP in 2010— wrote a treatment note for a March 21, 2016 appointment stating that Plaintiff's chronic problems are "stable" and that Flexeril and cannabis help. (AR 606.) Plaintiff argues that symptoms can be "stable" and also disabling. (Doc. 8 at 13.) That is true, but when read as a whole, the ALJ's decision does not suggest a contrary conclusion. The ALJ's reference to the

fact that Flexeril and cannabis helped Plaintiff's symptoms shows that the ALJ was considering the factors under 20 C.F.R. § 404.1529(c)(3).

Plaintiff also asserts that the ALJ failed to consider Dr. McPartland's other notations from the March 21, 2016 appointment, including remarks that the leg pain "comes and goes"; that temperature, stress, and anxiety make it worse; and that the pain is "sometimes bad enough to stay in bed." (AR 606.) It is true that the ALJ did not specifically quote those additional remarks from the March 21, 2016 treatment note. But those remarks appear in the "subjective" portion of Dr. McPartland's treatment note, so that is a plausible explanation for why the ALJ did not specifically quote them in her discussion of objective medical findings. Moreover, as discussed above, the ALJ did recognize "significant" functional limitations stemming from Plaintiff's HSP. (AR 24.) To the extent that Dr. McPartland's remarks relate to the issue of "reliability," the court addresses that topic below.

### D. Course of Medical Treatment

Plaintiff faults the ALJ for failing to explain how his "course of medical treatment" undermines the alleged severity of his symptoms. (Doc. 8 at 10 & n.5.) The Commissioner maintains that the ALJ "reasonably inferred that someone with the disabling symptoms that Plaintiff alleged would have been placed on a more structured treatment plan." (Doc. 9 at 6.)

The discussion above reflects Plaintiff's course of treatment during the relevant time period. He treated with neurology specialists Dr. Tandan and Dr. Waheed. He used prescription medications, including Baclofen and Flexeril (muscle relaxants). (*See* AR 449, 606.) He received physical therapy. He does not require an assistive device for ambulation. (AR 452.) Dr. McPartland prescribed medical marijuana on March 17, 2015. (AR 489.) The ALJ's decision reflects that she considered this course of medical treatment. (*See* AR 23–26.)

Plaintiff's course of medical treatment during the relevant time period was conservative. The court recognizes that no additional treatments are typically indicated for HSP. *See Hereditary Spastic Paraplegia Information Page*, Nat'l Insts. of Health, https://www.ninds.nih.gov/Disorders/All-Disorders/Hereditary-spastic-paraplegia-Information-Page (last visited Feb. 1, 2019) ("There are no specific treatments to prevent, slow, or reverse HSP. Symptomatic treatments used for spasticity, such as muscle relaxants, are sometimes helpful. Regular physical therapy is important for muscle strength and to preserve range of motion."). In light of that, this issue is relatively neutral in the overall analysis. If the ALJ erred on this point, the error was harmless in light of the ALJ's analysis of the remainder of the evidence.

## II.    "Reliability"

Plaintiff argues that the ALJ failed to consider his allegations regarding problems being reliable and sustaining activity. He lists nine examples of evidence that he asserts demonstrate "reliability" issues and his need to take unscheduled breaks from any job. (Doc. 8 at 5–7.) The Commissioner maintains that the ALJ did consider the relevant evidence, but reasonably discredited that evidence based on other substantial evidence in the record. (Doc. 9 at 2–4.)

Summarizing Plaintiff's testimony at the hearing, the ALJ noted Plaintiff's allegation that he is unable to work "due to the unpredictability of his symptoms" and because "he would need extra breaks." (AR 23.) Since the ALJ explicitly mentioned this testimony, the court rejects Plaintiff's contention that the ALJ "ignored" the issue. Rather, the ALJ found that testimony to be "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) For the reasons stated below, substantial evidence supports this conclusion.

16

## A.    Plaintiff's "Reliability" Evidence

The court begins by outlining the nine examples of evidence that Plaintiff cites. First, he states that he consistently reported that his ability to function varied daily, depending on factors such as amount of sleep, weather, medications, and stress. That was his testimony at the March 4, 2016 hearing. (*See* AR 54–55, 69–70, 74–75.) Notations from treatment with psychologist Paula Nath are in accord. (*See* AR 462, 465, 477, 521, 537.)

Second, Plaintiff notes that he reported ongoing fatigue and exhaustion that interfered with his ability to sustain and complete tasks. At the hearing, he testified that he experienced fatigue and exhaustion as a result of the spasticity in his legs and because of his medications. (AR 64.) There are additional mentions of fatigue and exhaustion in the record, including at Plaintiff's first appointment with Dr. Tandan on June 17, 2014. (AR 331.) Third, Plaintiff refers to his testimony that spasticity and clonus in his legs made it uncomfortable for him to walk or move around, and the he would frequently lie down and try to fall asleep. (AR 53.) Fourth, Plaintiff references his testimony about performing only five- to ten-minute chores, taking baths to reduce leg symptoms, and how he needed to sit down after five or ten minutes of standing. (AR 55, 72.)

Fifth, Plaintiff notes his testimony about his part-time volunteer job at a medical marijuana dispensary in the spring of 2014. He described doing three four-hour shifts per week there, with a half-hour for lunch. (AR 55.) Most of the work involved sitting in a chair at a table and using scissors to trim flowers. He was permitted to change positions, stretch, or walk around every 20 minutes. (AR 78.) According to an undated letter from the dispensary's executive director, Alexandra Ford, she and her staff observed that Plaintiff had to take breaks about every half hour, that his balance was not always great, that he would slow down as the day progressed,

that he would move very slowly with an exaggerated gait by the end of the day, and that he would often mention that he was headed home for a nap after his shift. (AR 301.) Ms. Ford stated that "[i]t was clear to the staff that 4 hours['] worth of work a day was a struggle for [Plaintiff]." (*Id.*)

Sixth, Plaintiff refers to his testimony about the part-time sanding work he did in the fall of 2013. He testified that he had a flexible schedule without set times. (AR 59.) He was also able to take breaks at will, which he could use to sit, stretch, or even take a half hour off for a nap. (*Id.*) Seventh, Plaintiff cites a portion of Dr. Tandan's treatment note from the October 2, 2014 appointment. In that note, Dr. Tandan wrote: "[I]n my opinion, he deserves disability in view of his progressive degenerative neurological disorder producing significant weakness and stiffness of his legs and an inability to conduct a normal day's work." (AR 412.)

Eighth, Plaintiff notes that he consistently reported that his symptoms worsen in the cold. Finally, Plaintiff refers to his testimony about his participation in a smoking study at the University of Vermont (UVM). Plaintiff received compensation for his participation in 2015. (AR 218.) He testified that he drove himself to and from UVM, a 75-minute drive each way, and that he would stop halfway to walk around. (AR 67.) Once at UVM, he was permitted to take his shoes off, put his feet up, stand up, or leave the room as needed for stretching. (*Id.*) Between the travel and the sessions at UVM, he spent up to seven hours each day that he participated. (*Id.*) He testified that by the end of such a seven-hour day, he felt "[v]ery uncomfortable" and "very ready to get home so I could actually medicate." (AR 68.)

### B.     Commissioner's Position

The Commissioner observes that much of Plaintiff's "reliability" evidence consists of his own subjective statements. (Doc. 9 at 4.) The Commissioner also relies on the "substantial

evidence" standard, under which, "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner maintains that there is other substantial evidence in the record supporting the ALJ's position, and that Plaintiff has not met his burden of showing that the evidence is insufficient or incorrect. (Doc. 9 at 2–4.)

## C.    Substantial Evidence Supports the ALJ's "Reliability" Conclusion

Applying the "substantial evidence" standard, the court concludes that the ALJ's determination on the "reliability" issue must be upheld. The following evidence supports the ALJ's decision. The objective medical findings—discussed above—showed difficulty walking, with periods of leg spasms and some pain, but no ambulatory aid used, and normal sensory exam and strength in the lower extremities. Plaintiff had a positive response to PT, *see supra*, and to medication. (*See* AR 449 (increased dose of Baclofen helped Plaintiff's symptoms "significantly"); AR 606 (Flexeril and cannabis help).) The ALJ recognized Plaintiff's testimony that his medications make him fatigued. (AR 23.)

In addition to considering Plaintiff's medication and treatment—factors (iv) and (v) under 20 C.F.R. § 404.1529(c)(3)—the ALJ also considered factor (iii): precipitating and aggravating factors. The ALJ recognized Plaintiff's sensitivity to cold (AR 23), and expressly included a limitation in the RFC. (AR 22.) Regarding factor (vi), the ALJ considered Plaintiff's testimony about needing to change positions, and included a limitation in the RFC. (*Id.*) The ALJ further considered factor (i): Plaintiff's daily activities. The court discusses the evidence relating to that factor below.

19

According to the ALJ, Plaintiff's "reported activities of daily living also show an independent and relatively active daily routine." (AR 25.)

> He reports that he does not need an assistive device to ambulate. He testified that he is able to drive about 30 to 45 minutes before his legs become stiff, and then he is able to continue driving after a stretch break. He lives in a house and is able to manage the stairs using just the hand rail. He has a social life, with friends, and has been divorced and with a new girlfriend in the relevant time period. He enjoys activities such as reading and photography.

(*Id.* (citations omitted).) As discussed above, the record supports these conclusions.[9]

The ALJ also considered "various work activity" that Plaintiff performed, although none of that activity rose to the level of substantial gainful activity. (AR 19; *see also* AR 25.) The ALJ stated that Plaintiff did work sanding timber frames after the alleged onset date. (AR 19, 25.) The Commissioner asserts that Plaintiff performed the sanding job "during the relevant period." (Doc. 9 at 3; *see also* Doc. 9-1 ¶ 6(a).) Plaintiff's two-page reply memorandum focuses almost exclusively on correcting an error about the dates that he performed the sanding work. (*See* Doc. 10.)

Indeed, substantial evidence does not support the conclusion that Plaintiff performed the sanding job after October 31, 2013. Plaintiff initially testified that he did the sanding work "September to I think the end of or mid-November in 2014." (AR 53.) Later in his testimony he corrected himself, stating that the sanding work occurred in 2013. (*See* AR 58–59.) Plaintiff did not dispute Attorney Massicotte's statement that the sanding work occurred before the alleged onset date. (AR 60.)

---

[9] There is one exception: contrary to the ALJ's assertion that Plaintiff can manage the stairs in his home using "just" the hand rail, he testified that he also uses the wall. (AR 50.) This does not undermine the ALJ's reasoning sufficiently to change the court's conclusion.

The ALJ cited Plaintiff's July 1, 2014 Work Activity Report for the proposition that he did the sanding job from September 2013 through June 2014. (AR 19.) But the report does not support the conclusion that the sanding work continued after October 2013. The report identifies two different jobs: self-employed sanding and self-employed canoe repair. (AR 259.) Although the report does list earnings in September and October 2013 and March through June 2014 (AR 260), none of the 2014 dates can fairly be attributed to the sanding work. This is especially evident in light of Plaintiff's testimony that he stopped sanding in part because it was getting cold. (AR 59.) His initial suggestion that he thought he did sanding until the middle or end of "November" is unsupported by any other evidence, and is contradicted by his Work Activity Report, which appears to show no earnings from that activity after October 2013. (*See* AR 260.)

In light of the above, the court finds that the ALJ erred in concluding that Plaintiff performed the sanding work after the alleged onset date. The court is convinced, however, that this error was harmless. *See McIntyre*, 758 F.3d at 148 (courts "apply harmless error analysis" to challenges of an ALJ's decision). The sanding work was immediately prior to the alleged onset date, and Plaintiff's testimony was that he stopped that work because only heavier work remained and because it was getting cold—not because his functional capacity had changed. The ALJ properly considered the sanding work as part of her evaluation. *See Barca v. Comm'r of Soc. Sec.*, No. 2:13-cv-68, 2014 WL 257858, at *9 (D. Vt. Jan. 23, 2014) (ALJ properly considered employment from just before the alleged disability onset date).

Although Plaintiff testified that he had a flexible schedule at the sanding job, substantial evidence supports the ALJ's remark that it was "relatively strenuous" work. (AR 25.) The work involved wearing a respirator and using power sanders on timber beams. (AR 59.) Plaintiff testified that he worked 20 to 30 hours per week on the sanding job. (AR 60.)

Moreover, the ALJ correctly recounted other work activities after the alleged onset date, including self-employed boat repair, his volunteer work at the dispensary, and his participation in the UVM smoking study. (*See* AR 25.) The court considers each of the work activities in turn. The UVM study is relevant largely because, as the ALJ noted, Plaintiff was able to drive himself 75 minutes each way to participate. (AR 25.)[10]

Although Plaintiff testified that he was able to take breaks at will while doing the self-employed boat repair work and that he ultimately could not keep up with the work (AR 57–58), the ALJ accurately described boat repair work as a "relatively strenuous" job (AR 25). Notably, in addition to being a relatively physical job, Plaintiff did the work in an outdoor car tent between March and June 2014. (AR 57, 260–61.) That work attempted to leverage Plaintiff's boatbuilding skills, but the conditions and demands probably exceeded Plaintiff's capacity.

The ALJ made a similar point regarding Plaintiff's part-time volunteer work at the dispensary in 2014. When discussing the opinion of Ms. Ford in her undated letter regarding Plaintiff's work at the dispensary, the ALJ gave the opinion "little weight" because Ms. Ford is not a medical expert and because Plaintiff "testified that he did such work as gardening and other jobs requiring him to be fairly active, and he was also apparently working other jobs as well at the time." (AR 29.) The regulations required the ALJ to consider this nonmedical opinion, 20 C.F.R. § 404.1527(f), and the court concludes that the ALJ articulated a sufficient basis for the weight given to Ms. Ford's opinion.

The ALJ could reasonably find that Plaintiff's self-employed boat repair work between March and June 2014 overlapped with his volunteer work at the dispensary, where he worked for

---

[10] The ALJ also remarked that Plaintiff traveled to Florida just prior to his March 4, 2016 hearing. (AR 25.) Substantial evidence supports that finding. (*See* AR 540.) Although not a work activity, the Florida trip—like the UVM study—reflects Plaintiff's capacity to travel.

"several months" before leaving in August 2014. (*See* AR 260, 301.) The dispensary job also involved some physical work. Plaintiff testified that he did work trimming and harvesting flowers and did some "minor dish washing at the counters." (AR 55.) Ms. Ford also wrote that Plaintiff was given some sedentary jobs but also some jobs that required him to stand. (AR 301.)

Of course, none of these work activities discussed above rose to the level of substantial gainful activity. But the ALJ did not rely on them to show that Plaintiff actually performed full-time work without accommodation for any limitations. When coupled with Plaintiff's daily activities and other evidence, the evidence of Plaintiff's work activities supports the ALJ's assessment of symptoms.[11]

The ALJ also cited other evidence that supports her subjective symptom evaluation. A treatment note from November 13, 2015 indicates that he wanted to attend a "marijuana cultivation college to become certified as a cultivator." (AR 532.) He expressed interest in "returning to photography or setting up a community studio space" at a January 22, 2016 appointment. (AR 540.) Plaintiff's consideration of those activities suggests that he believed he could take on those responsibilities, and lend some additional support to the ALJ's determination.[12]

---

[11] The ALJ stated that Plaintiff "worked part time as a ticket counter worker at a ski resort" during the relevant time period. (AR 25.) The court's review has uncovered no evidence supporting that statement. Attorney Massicotte asked Plaintiff at the hearing about whether he had a "ticket counter" or "some sort of job" at a ski resort. (AR 62.) Plaintiff testified that he worked full-time as a cook and in accounting for the Sugarbush ski resort between 1999 and the mid-2000s. (AR 63.) At some point after the alleged onset date Plaintiff applied for a part-time night accountant's position at Sugarbush, but he was not hired. (AR 62.) However, in light of the conclusions herein, the court finds the ALJ's error on this point to be harmless.

[12] The ALJ also noted that Plaintiff's counseling records "reflect that he consulted with his attorneys regarding what work to accept" in order to make sure that it would not compromise his disability case. (AR 25.) A note from an October 5, 2015 session does indeed indicate that Plaintiff checked with his lawyers prior to commencing the UVM smoking study "to make sure [it] wouldn't compromise his [disability] case." (AR 531.) The ALJ found that this evidence

23

### III.    Medical Opinion Evidence

Finally, the regulations require ALJs to consider medical opinions when evaluating symptoms. 20 C.F.R. § 404.1529(c)(1). Plaintiff specifically challenges the ALJ's treatment of his primary care providers' opinions. (Doc. 8 at 13.) The court turns to that final issue here.[13]

### A.    Mr. May's June 2015 Opinion

The ALJ considered and assigned weights to several medical opinions, including the restrictive June 2015 Medical Opinion (Physical) of Plaintiff's primary care provider, Shaw May, PA-C, LICSW, which is co-signed by Marian Bouchard, M.D.  (AR 509–12.)[14]  Regarding lifting, posture, and manipulation, Mr. May opined that Plaintiff can lift 10 pounds "occasionally," lift 20 pounds "less than occasionally," and can never lift 50 pounds.  (AR 509.) The opinion states that Plaintiff can occasionally climb stairs, never climb ladders, and perform the remaining postural activities "less than occasionally."  (AR 510.)  The opinion also states that he can operate foot controls "occasionally."  (*Id.*)

Regarding the ability to sit, stand, and walk, Mr. May opined that Plaintiff can sit for 45 minutes, stand for 5 minutes, and walk for 10 minutes at a time without needing to change position.  (*Id.*)  He opined that Plaintiff can sit for about four hours total in an eight-hour

---

suggested that Plaintiff "may have been choosing work based upon avoiding substantial gainful activity levels for purposes of his disability claim, and may not be as limited in functioning as alleged."  (AR 25.)  The ALJ's finding on this particular point is speculative, but the ALJ's subjective symptom evaluation is sound for the other reasons stated in this decision.

[13] Dr. Tandan's October 2014 statement that Plaintiff "deserves disability" is not a medical opinion, 20 C.F.R. § 404.1527(d), which explains why the ALJ did not include a discussion of that statement in her analysis of medical opinions.

[14] The court has considered the ALJ's analysis of the other medical opinions in the record, but has not included a detailed discussion of those other opinions here because Plaintiff does not challenge them.  In any case, the court has identified no error with the ALJ's treatment of the remaining medical opinions.

workday, but can stand and walk for less than two hours total in an eight-hour workday. (*Id.*)
Mr. May further opined that Plaintiff needs a job that permits shifting positions at will between
sitting and standing or walking. (AR 511.) He stated that Plaintiff is unable to stay positioned at
a work station for an eight-hour workday without needing to leave to relieve symptoms. (*Id.*)

With respect to disruptions to work routine and absenteeism, Mr. May opined that
Plaintiff's symptoms would likely cause him to be off-task doing simple work for more than
20% of the time. (*Id.*) Mr. May stated that Plaintiff has episodic attacks or symptoms that would
temporarily incapacitate him from work for periods of 10–15 minutes. (*Id.*) Mr. May stated that
Plaintiff would likely miss more than four days of work per month, and he handwrote his opinion
that Plaintiff would likely miss about "15–20 days/month." (*Id.*) Mr. May and Dr. Bouchard
signed an "update" on January 25, 2016, stating that their assessment of Plaintiff's functional
capacity had not changed since the June 2015 opinion. (AR 541.)

## B.    The ALJ's Treatment of Mr. May's Opinion

The ALJ gave this opinion "limited weight" for the following reasons.

[I]t is overstated and appears to be reliant upon the claimant's self-reported
limitations, and [does] not cite[] objective testing or clinical findings. The records
contain limited treatment notes from Mr. May, and no notes of Dr. Bouchard
(Exhibit 16F). The earlier opinion indicates that the claimant does have capability
of some work, consistent with work in the sedentary to light exertional level, with
sitting up to 4 hours per workday, which is generally consistent with the work
assessment above.

(AR 27.) The ALJ also questioned the authenticity of the June 2015 opinion:

Further, I note the handwriting on Exhibit 16F [the June 2015 opinion] appears to
be similar to Exhibit 24F, the claimant's counselor, Paula [Nath], and it is not clear
whether Mr. May actually completed the forms. While I have fully considered the
opinion evidence, this apparent similarity raise[s] questions about the authenticity
of the document, and therefore about the reliability of the opinion.

(*Id.*)

25

## C. The ALJ Properly Assigned Little Weight to Mr. May's Opinion

The regulations required the ALJ to evaluate Mr. May's opinion and assign it a weight after considering the following factors: whether the provider examined Plaintiff, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c). Plaintiff does not argue that Mr. May's opinion was entitled to controlling weight under the treating-physician rule.[15] Instead, Plaintiff asserts that each of the ALJ's reasons for assigning "limited weight" to Mr. May's opinion should be dismissed. (Doc. 8 at 13.)[16] The Commissioner maintains that the ALJ properly discounted Mr. May's opinions.

Substantial evidence supports the ALJ's determination that Mr. May's opinion is "overstated." Perhaps most notably, Mr. May opined that Plaintiff would be off task 20% of the time and would likely miss 15–20 days of work per month. Those opinions are inconsistent with Plaintiff's relevant work activities, and his sanding work in particular.

It was not error for the ALJ to remark that Mr. May's opinion appears to be reliant upon Plaintiff's self-reported limitations. A doctor's reliance on a patient's subjective complaints does not necessarily undermine the doctor's opinion as to functional limitations because "[a] patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*,

---

[15] The treating-physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). The regulations currently in effect state that no deference or controlling weight is given to any medical opinion, 20 C.F.R. § 404.1520c(a), but those provisions do not apply in this case.

[16] In a footnote, Plaintiff also asserts that the ALJ's suggestion that Mr. May's opinion might not be authentic is "dumbfounding." (Doc. 8 at 13 n.7.) The Commissioner maintains that Plaintiff was not harmed by the ALJ's "observation" about the handwriting because the ALJ did not reject the opinion on authenticity grounds. (Doc. 9 at 14.) The court agrees with the Commissioner on this point, particularly because the ALJ stated that she fully considered the opinion evidence notwithstanding the "questions" that she raised about authenticity.

335 F.3d 99, 107 (2d Cir. 2003) (alteration in original). But unlike *Green-Younger*, this is not a case where the ALJ's RFC determination is based on a "perceived lack of objective evidence." *Id.* at 108. The ALJ found that there was objective evidence of Plaintiff's HSP and of significant limitations. (*See* AR 24.) The court is satisfied that the ALJ used the proper legal standards in performing her subjective symptom evaluation and that her evaluation is supported by substantial evidence, as discussed above.

The ALJ also properly observed that Mr. May did not cite sufficient objective testing or clinical findings to support his opinion. Responding to a prompt to identify relevant clinical findings and objective signs, Mr. May wrote: "Dr. Rup Tanden + Dr. Waheed – both neurologist[s] [at] UVM [Medical Center] [diagnosed Plaintiff] thru genetic testing [with] HSP. Gene specific test spg4 – mutation." (AR 509.) The gene test is an objective test that supported the HSP diagnosis, but neither the gene test nor the HSP diagnosis are sufficient to draw conclusions about functioning. *See Hereditary Spastic Paraplegia Information Page*, Nat'l Insts. of Health, https://www.ninds.nih.gov/Disorders/All-Disorders/Hereditary-spastic-paraplegia-Information-Page (last visited Feb. 1, 2019) ("The prognosis for individuals with HSP varies[.] Some individuals are very disabled and others have only mild disability.").

Related to the issue of clinical findings, the ALJ remarked that the record included "limited" treatment notes from Mr. May. (AR 27.) Plaintiff maintains that Mr. May treated him six times in 2014 and four times in 2015, which Plaintiff asserts is not "limited treatment." (Doc. 8 at 14.) The court agrees that the number of visits reflects more than a cursory treatment relationship. But the treatment notes are "limited" insofar as they provide scant support for Mr. May's restrictive opinion. Mr. May's treatment notes reflect abnormal gait (although frequently within normal limits), leg spasms, and twitches. (*See* AR 345, 347, 398, 400, 403,

405, 523, 528.) None of those notations depart from the ALJ's observations about the abnormal physical signs related to Plaintiff's HSP and his significant functional limitations.

Finally, Plaintiff takes issue with the ALJ's assertion that Mr. May's opinion indicates that Plaintiff retains the "capability of some work." (AR 27.) Plaintiff asserts that the ability to do some physical work is not indicative of being able to sustain full-time work. That is true as a general matter. *See Balsam v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[A] claimant need not be an invalid to be found disabled." (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988))). But as discussed above, the ALJ properly considered Plaintiff's activities and all of the evidence to complete her subjective symptom evaluation and arrive at an RFC that is supported by substantial evidence.

## Conclusion

Plaintiff's motion to reverse (Doc. 8) is DENIED, the Commissioner's motion to affirm (Doc. 9) is GRANTED, and the decision of the Commissioner is AFFIRMED.

Dated at Burlington, in the District of Vermont, this __ day of February, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court

28